# EXHIBIT

# 1

## ASSET PURCHASE AGREEMENT

between

### Alliant Manufacturing, LLC, an Illinois limited liability company (as "Buyer")

and

### Raani Corporation, an Illinois Corporation
### (as "Company")

Dated as of June ___7___, 2013



EXHIBIT

tabbies

**THIS AGREEMENT**, dated as of June *1*, 2013, by and between **ALLIANT MANUFACTURING, LLC**, an Illinois limited liability company ("Buyer"), **RAANI CORPORATION, an Illinois corporation**, (the "Company") and **RASHID CHAUDARY** ("Chaudary"), only as to those obligations specifically set forth herein, is as follows:

<u>W I T N E S S E T H</u>:

**WHEREAS**, the Company is a private label manufacturer and serves the health and personal care, OTC pharmaceutical, and household and professional salon markets at 5202 W. 70th Place, Bedford Park, Illinois 60638 (the "Business"); and,

**WHEREAS**, the Company desires to sell to Buyer, and Buyer desires to purchase from the Company, substantially all of the operating assets used or useful in the Business, as well as the Business as a going concern (the "Transaction").

**NOW, THEREFORE**, in consideration of the foregoing recitals, and the mutual covenants and agreements set forth, the parties agree:

1.      **PURCHASE AND SALE OF ASSETS.**

    1.1.    <u>**Description of Purchased Assets**</u>.   The Company shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase and accept from the Company, free and clear of any and all encumbrances and liens (except as set forth in paragraph 1.3), all of the Company's right, title and interest in the following assets used or useful in the Business (collectively sometimes referred to as the "Purchased Assets"), as of the date and time that the purchase and sale takes place (the "Closing"):

        (a)    All machinery, equipment, furniture, furnishings and fixtures, computer hardware and software and other tangible assets as set forth in Schedule 1.1(a) (collectively the "Fixed Assets");

        (b)    All of Company's inventory on hand at the Closing Date;

        (c)    All of Company's account receivables on hand at the Closing Date;

        (d)    All of Company's contracts with customers for the manufacture of goods ("Existing Contracts") as set forth in Schedule 1.1(d);

        (e)    All of the Company's right, title and interest, if any, in its customer lists, supplier lists, catalogs, price lists, marketing and promotional materials, operating data, know how, trade secrets, licenses or other rights to technology or information, all operating, sales, and marketing data used or useful in, or pertaining to, the Business and the other items in this Section 1.1(e) (the "Ancillary Rights"), as set forth in Schedule 1.1(e);

        (f)    The goodwill of the Business;

- 1 -

(g)     The Company's right, title and interest, if any, in its telephone numbers, facsimile transmission numbers and related yellow pages listing, affiliated with the Business;

(h)     Any and all formulas owned by the Company relating to the manufacture of products;

(i)     Any utility deposits; and

(j)     All other property rights of every kind and nature owned or held by the Business on the Closing Date used or useful in or relating to the Business, regardless of whether referred to in this Agreement, except for the assets enumerated below as retained by the Company.

1.2.     **Property to Be Delivered But Not Sold.** As a private label manufacturer, the Company is in possession of certain formulas, which its various customers have delivered or the Company has developed for its various customers at such customer's request, to allow the Company to manufacture the products on such customer's behalf. The Company holds no title to, but will deliver to Buyer at Closing, all such formulas to allow Buyer to operate the Business. The Company shall license to the Buyer the right to use the name Raani and the domain name www.raani.com including related electronic mail for a period of one (1) year.

1.3.     **Assets Retained by the Company.** Excluded from the assets sold to Buyer under this Agreement are the following, all of which shall be retained by the Company:

(a)     the sponsorship of, and all assets associated with, any and all plans or arrangements sponsored by the Company for the benefit of its employees, including without limitation any and all pension plans, compensation plans, and welfare benefits maintained by the Company;

(b)     any and all right, title and interest of the Company in, to or under any policies of insurance, including but not limited to Company-owned life insurance policies, or any benefits payable or paid thereunder, purchased or maintained by the Company;

(c)     all sums owing to the Company, whether as accounts receivable or otherwise, existing as of March 31, 2013, from RNS Bedford Park, LLC, Rashid Chaudary, BioCare Labs, Inc. and SKA Enterprise, LLC;

(d)     all policies of insurance, including theft, fire, liability (including products liability), workers' compensation, life, property and casualty and any and all other insurance owned or held by the Company in connection with the Business. Nothing in this paragraph 1.3(d) is or is intended to create an insurable interest in the assets sold to Buyer or in the Business, provided, however, the Buyer's obligation to complete the Transaction contemplated by this Agreement shall be contingent upon Buyer obtaining insurance similar to that currently held by Company; and

(e)     all refunds or amounts payable as prepaid insurance and insurance/split value; and

- 2 -

(f)    The trademark/trade name "RAANI" and the domain name www.raani.com.

### 1.4.    Limited Assumption of Liabilities.

(a)    At Closing, the Buyer shall assume the obligations of Company to Cole Taylor Bank (the "Bank Obligations") which obligations shall have a principal balance due as of the Closing Date of Two Million Seven Hundred Thousand Dollars ($2,700,000.00) more or less; provided, however, the Buyer's obligation to complete the Transaction contemplated by this Agreement shall be contingent upon Cole Taylor Bank providing Buyer a loan sufficient to pay all of the Bank Obligations;

(b)    The Buyer shall be responsible for all accounts payables owing for the purchase of goods including inventory along with other business related payables on hand at the time of Closing excepting specifically any amounts owing to parties excluded on Schedule 1.4(b) and identified as "Biocare L", "Cincinnat", "Fidelity", "Johnson &", "Miller Co" and "Nationwid";

(c)    Except as set forth in this Section 1.4(c) and in Schedule 1.4(c), which Schedule shall identify all assumed liabilities, other than trade payables, and the loan owing to Cole Taylor Bank, the Buyer is acquiring the Purchased Assets free and clear of any and all encumbrances and liens (except for the liens and encumbrances held by Cole Taylor Bank), and with no assumption of the Company's obligations or liabilities.  The Company shall fully and timely perform and discharge all of the Company's obligations and liabilities to creditors and others and shall indemnify and hold Buyer harmless against any and all claims arising out of any failure to discharge such obligations or liabilities, or from the Company's ownership of the Purchased Assets or operation of the Business prior to the Closing.  Buyer shall fully and timely perform and discharge all of the Buyer's obligations and liabilities to creditors including Cole Taylor Bank and others and shall indemnify and hold the Company harmless against any and all claims arising out of any failure to discharge such obligations or liabilities, or from Buyer's ownership of the Purchased Assets or operation of the Business after the Closing.

## 2.    PURCHASE PRICE AND PAYMENT.

### 2.1.    Purchase Price.    The purchase price for the Purchased Assets (the "Purchase Price") is Five Million Three Hundred Thousand Dollars ($5,300,000.00) payable as follows

(a)    Two Million Dollars ($2,000,000.00) payable by wire transfer to the Company at Closing;

(b)    Buyer's execution of a Promissory Note, payable to Seller, in the principal amount of Five Hundred Thousand Dollars ($500,000.00), plus or minus prorations, which amount is inclusive of interest, payable as follows: Fifteen Thousand Dollars ($15,000.00) per month payable on the first day of each calendar month commencing on July 1, 2013 and continuing through December 1, 2013 with the balance of Four Hundred Ten Thousand Dollars payable on December 31, 2013 (the "First Note") in the form set forth in Schedule 2.1(b)(i), which First Note shall be guaranteed by the following members of Buyer: Saeed R. Khan,

Rizwan Khan and John T. Gruenwald ("Buyer's members"), in the form set forth in Schedule 2.1(b)(ii) and shall be secured by a lien on the assets transferred under this Agreement having a priority over all liens other than the liens granted to and held by Cole Taylor Bank in the form set forth in Schedule 2.1(b)(iii)and lien on all assets;

(c)     Buyer's execution of a Promissory Note, payable to Seller, in the principal amount of One Million Four Hundred Thousand Dollars ($1,400,000.00) which amount is inclusive of interest, payable as follows: Ten Thousand Dollars ($10,000.00) per month on the first day of each calendar month commencing on January 1, 2014 and continuing through June 1, 2014, then Twenty-Five Thousand Dollars ($25,000.00) per month on the first day of each calendar month commencing on July 1, 2014 and continuing through June 1, 2016 with the balance of Seven Hundred Forty Thousand Dollars ($740,000.00) payable on July 1, 2016 (the "Second Note") in the form set forth in Schedule 2.1(c)(i), which Second Note shall be guaranteed by Buyer's members in the form set forth in Schedule 2.1(b)(ii) and shall be secured by a lien on the assets transferred under this Agreement having a priority over all liens other than the liens granted to and held by Cole Taylor Bank in the form set forth in Schedule 2.1(c)(ii);

(d)     Buyer's execution of a Promissory Note, payable to Seller, in the principal amount of One Million Four Hundred Thousand Dollars ($1,400,000.00) which amount is inclusive of interest, payable in full on June 30, 2017 (the "Third Note") in the form set forth in Schedule 2.1(d)(i), which Third Note shall be guaranteed by Buyer's members in the form set forth in Schedule 2.1(b)(ii) and shall be secured by a lien on the assets transferred under this Agreement having a priority over all liens other than the liens granted to and held by the Company to secure the Second Note and by Cole Taylor Bank in the form set forth in Schedule 2.1(c)(iii);

(e)     In the event of default including a failure to timely deliver payment, each of the promissory notes will bear interest at nine percent per annum until such default is cured within thirty (30) days.

(f)     **Release of Obligation.**  Buyer, as a part of the satisfaction of the promissory note made in favor of Cole Taylor Bank referenced in Section 2.1(b), shall obtain from Cole Taylor Bank (a) a release of all liability owing by the Company, Chaudary and BioCare Labs, Inc., whether as an obligor, guarantor or otherwise, and (b) a release of all liens, claims and encumbrances against 7950 County Line Road, Burr Ridge, Illinois.

2.2.    **Other Considerations.**    Buyer agrees to execute an Employment Agreement by and between Buyer and Chaudary for a term of five (5) years with annual compensation of Three Hundred Thousand Dollars ($300,000.00) in the form set forth in Schedule 2.2.  The Employment Agreement shall further include such other terms, including a Covenant Not to Compete for a period of three (3) years after the termination of the Employment Agreement, as are agreeable to the parties and their respective counsel.  Notwithstanding the foregoing, Chaudary may perform services for hire to branded company or companies owned by Chaudary's immediate family members; provided, however, that Chaudary shall allow the Buyer the first right of refusal to perform the manufacturing process on the same terms as agreed for any such work for products produced for third party customers.  Buyer must agree to exercise such first right of refusal within thirty (30) days of the delivery to Buyer of the terms of

-4-

engagement for such work. Such right of first refusal shall not extend to products if manufactured by such branded company or companies for sale to a party other than a private label manufacturer. Nothing in this Section or otherwise shall authorize Chaudary to perform services for hire in competition with Buyer.

2.3.    **Allocation of Purchase Price**. The parties agree that allocation of the Purchase Price among the Purchased Assets shall be in accordance with the allocation described in Schedule 2.3. Buyer and the Company shall prepare and file with the Internal Revenue Service Form 8594 setting forth such agreed allocation.

3.    **Due Diligence Investigations**.

3.1.    Company agrees it will make available to Buyer and its authorized representatives for their inspection and review upon reasonable notice to Company through the Due Diligence Period defined below all such information concerning the business, properties, personnel, customers, creditors, vendors and suppliers, assets, liabilities and affairs of Company related thereto, including but not limited to tax returns for the past three (3) years, the most recent profit and loss statement and balance sheet, all books, records, accounts, purchase orders and other documents pertaining thereto (the "Financial Records"). Seller further agrees to provide State UCC searches, including federal tax liens, judgments and bankruptcy filings. Seller further agrees to make available to Buyer and its authorized representatives a list of all products sold in the last five (5) years and their formulations and manufacturing processes. Company, during normal business hours throughout the period prior to the Closing Date, shall permit Buyer and its authorized representatives to inspect, observe and become acquainted with the operations of Company and the Sale Assets, provided Buyer and its authorized representatives shall not unreasonably interfere with the operation of the business of Company. Buyer covenants and agrees it will hold and cause its authorized representatives and personnel to hold in strict confidence all information obtained from Company, and if the Transaction is not consummated as contemplated, Buyer will return and cause its authorized representatives to return all such information and materials, and will not disclose or divulge to or use for its benefit or the benefit of any other person, firm or corporation, or allow its authorized representatives to do so, any portion of such information; provided, however, that Buyer shall not be obligated to treat as confidential any information which Company does not treat as confidential, or of which Buyer had specific knowledge prior hereto or which is or becomes publicly known or available other than by violation hereof.

3.2.    Notwithstanding Company's production of documents and other obligations set forth in paragraph 3.1 above, prior to Closing, Buyer may conduct such other due diligence investigations as may be necessary for Buyer to determine the feasibility of the purchase of the Business under this Agreement. The conduct of such other due diligence investigations shall not extend the Due Diligence Period set forth in paragraph 3.3.

3.3.    Provided Seller has delivered to Buyer all of the Financial Records, Buyer shall have fifteen (15) days following the execution of this Agreement (the "Due Diligence Period") in which to disapprove any aspect of the Business by written notice to Company in accordance with paragraph 3.4.

R - c

3.4.    If, for any reason whatsoever in Buyer's sole and absolute discretion, Buyer is not satisfied with the feasibility of the Purchase of the Business, or any part, Buyer shall have the right to terminate this Agreement by written notice to Company given on or before the expiration of the Due Diligence Period.  Buyer shall be deemed to have waived and/or satisfied the conditions and contingencies referred to in this Section 3 if Buyer does not notify Company on or before the last day of the Due Diligence Period that Buyer is canceling this Agreement based on the inspections and contingencies referred to in this Section.  Upon termination of this Agreement by Buyer pursuant to this Section 3, Buyer shall return to Company all the Financial Records provided by Company.

4.    **CLOSING.**

4.1.    **Time and Place.**  Closing of the Transaction (the "Closing") shall take place at the Offices of Jordan & Zito LLC, 55 West Monroe Street, Suite 3600, Chicago, Illinois, seven (7) days after the waiver or expiration of the Due Diligence Period (the "Closing Date"), or as otherwise agreed to between the parties.

4.2.    **Joint Deliveries.**

(a)    This Asset Purchase Agreement, if not signed prior to the Closing Date; and,

(b)    The Employment Agreement.

4.3.    **Deliveries by Company.**  At the Closing, the Company shall deliver to Buyer:

(a)    Certified copies of the resolutions of the Shareholder and Directors of the Company authorizing and approving this Agreement and the Transaction as set forth in Schedule 4.3(a);

(b)    A Certificate of Good Standing for the Company certified by the Illinois Secretary of State, which is attached as a part of Schedule 4.3(b);

(c)    A Bill of Sale regarding the Purchased Assets owned by the Company as set forth in Schedule 4.3(c);

(d)    Assignments regarding any Ancillary Rights registered with any federal or state government as set forth in Schedule 1.1(3);

(e)    Any consents identified on Schedule 8.3;

(f)    Such other endorsements, assignments, affidavits and other good and sufficient instruments of sale, assignment, conveyance and transfer, in form and substance reasonably satisfactory to Buyer and its counsel, as required to transfer the Purchased Assets to Buyer;

(g)     A certificate, in the form as set forth in Schedule 4.3(h), executed by the Company representing and warranting to Buyer that each of the Company's representations and warranties in this Agreement was accurate in all respects as of the date of this Agreement and are accurate in all respects as of the Closing Date as if made on the Closing Date; and,

(h)     Such other documents as Buyer may require to complete the Transaction.

4.4.    **Deliveries by Buyer**.  At the Closing. Buyer shall deliver to the Company:

(a)     The Purchase Price as determined under Section 2.1 above;

(b)     An executed original of the First Note;

(c)     An original of the Guaranty executed by each of Buyer's members;

(d)     An executed original of the Second Note;

(e)     The Security Agreement securing the repayment of the Second Note in a form acceptable to the Company;

(f)     An executed original of the Third Note;

(g)     The Security Agreement securing the repayment of the Third Note in a form acceptable to the Company;

(h)     A duly executed instrument of assumption (in form and substance reasonably satisfactory to the Company) of each of the Purchased Contracts;

(i)     Certified copies of the resolutions of Buyer authorizing and approving this Agreement, and all other transactions and agreements contemplated by this Agreement;

(j)     A Certificate of Good Standing for the Company certified to by the Illinois Secretary of State;

(k)     A certificate executed by Buyer representing and warranting to the Company that each of Buyer's representations and warranties in this Agreement was accurate in all respects as of the date of this Agreement and is accurate in all respects as of the Closing Date as if made on the Closing Date; and,

(l)     Such other documents as required to complete the Transaction contemplated by this Agreement.

5.     **Covenant Not to Compete**.  Company covenants and agrees it shall not, for a period of three (3) years following the Closing Date, alone or in conjunction with any other corporation, firm, partnership, person, venture or other entity, directly or indirectly, engage in

- 7 -

any activity or business which is the same or similar, or competitive with any activity or business engaged in by the Buyer because of this Agreement within Illinois. Company covenants and agrees that for a period of three (3) years following the Closing Date, it will not induce any employee, customer or supplier of Buyer to terminate its business relationship with Buyer, and Company will not use or reveal any secret or confidential information relating to the business of the Company acquired by Buyer; provided, however, that the foregoing shall not apply to any information which, following the Closing Date, is received by Company from a third person other than Buyer who is lawfully in possession of such information and not in the violation of any contractual or legal obligation to Buyer with respect to such information, or which is public knowledge or within the public domain other than as a result of disclosures by Company after the Closing Date. It is the desire and intent of the parties that the terms and provisions of this paragraph be enforced to the fullest extent permissible under the law and public policy applied by any jurisdiction in which enforcement is sought. If any portion of this paragraph shall be adjudicated to be invalid or unenforceable because it covers too extensive a geographical area or too long a period of time, then said portion shall be deemed reformed to the least extent necessary to make such portion valid and enforceable.

6.   **Lease Contingency.**   Buyer's obligation to complete the Transactions contemplated by this Agreement shall be contingent upon the Buyer and the owner of the property at which the Company conducts business entering into a lease agreement upon terms and conditions acceptable to Buyer and its counsel. Such lease shall have a term of five (5) years with the Buyer, as tenant, to have an option to extend the lease term for an additional five (5) years. Rent under the lease shall be $60,000 per month and will be triple net except that the landlord shall pay real estate taxes based on the real estate taxes owing for the 2012 tax year. Buyer, as tenant, will be responsible for maintaining the building and providing liability and property insurance naming the landlord as an additional insured. The Buyer, as tenant, shall be responsible for any increase in real estate tax over the annualized taxes assessed under the invoice for the second installment of real estate taxes for the base year of 2012. After third year of the lease term, rent will increase by three percent (3%) and shall increase by a like percentage every two (2) years thereafter. Buyer shall have a first right of refusal to purchase the Building during the term of the lease including extensions.

7.   **Prorations.**   On the Closing Date, Company and Buyer shall review a current Inventory, the Company's account receivables and the work in process and to the extent they are not substantially in the same amount as set forth in the financial statements as of April 30, 2013, and, if Buyer deems it necessary, negotiate such adjustments to the Purchase Price, which shall be reflected in the Note, as is necessary to carry out the intent of this Agreement.

8.   **Representations And Warranties Of The Company.**   The Company represents and warrants that:

8.1.   **Organization and Authority of the Company.**   The Company is a corporation duly organized, validly existing and in good standing under the laws of Illinois, and is duly authorized to transact business in Illinois, has all corporate power and authority to carry on the Business as now being conducted, and to own and operate its properties.

R - C

- 8 -

8.6.   **Title and Condition of Purchased Assets.**  The Company has and shall transfer to Buyer at Closing good and marketable title to the Purchased Assets, except as otherwise set forth in this Agreement or as disclosed in the lien and judgment search provided to Buyer, free and clear of all liens, pledges, charges, security interests, mortgages, encumbrances, title retention agreements, and claims or rights of others.

8.7.   **Intellectual Property.**  The Company does not hold or own any patents, copyrights, knowhow, or other trademarks or service marks.

8.8.   **Taxes.**  Except as disclosed in Schedule 8.7, all taxes, assessments, fees and other governmental charges upon the Company or upon any of its properties, assets, revenues, income or franchises owed by the Company (whether or not shown on any such return or report) have been paid.  To the best of the Company's knowledge, neither the Internal Revenue Service nor any other taxing authority is now asserting or threatening to assert against the Company any deficiency or claim for additional taxes or interest thereon or penalties in connection therewith or any adjustment that would have an adverse effect on the Business or the Purchased Assets.

8.9.   **Litigation/Potential Litigation.**  Except as set forth on Schedule 8.8, no action, suit, proceeding or investigation, whether conducted by any judicial, administrative or regulatory body or other person, is pending or, to the knowledge of the Company, threatened against the Company or any of the Purchased Assets, nor is there any basis for any claim or action known to the Company which might adversely affect the Purchased Assets or the Business, or impair the right or the ability of Buyer to carry on the Business as now conducted. The Company shall be responsible for any and all obligations for any liability incurred in the Litigation set forth in Schedule 8.8.

8.10.   **Labor Relations.**  As it relates to the Business, the Company does not know of any labor dispute pending or threatened, and the Company has not entered into any collective bargaining agreement binding upon Buyer.  The Company has no employment agreements providing for a fixed term of employment, and all the Company's employees are "at will" employees at the compensation rates disclosed as a part of the Financial Records, which also lists all employee benefits of the Company, including without limitation any bonus and employee ownership plans; health, disability and life insurance plans; fringe benefits such as automobile, cellular phones and the like; expenses reimbursement entitlements; and retirement or savings plans.

8.11.   **Ancillary Rights.**  The Company to best of its knowledge owns or has the sole and exclusive right to use the Ancillary Rights in the ordinary course of business as presently conducted, and consummating the Transaction will not alter or impair any such right. No claims have been asserted, and no claims are pending, by any person regarding the use of any such Ancillary Rights and, to the best of the Company's knowledge, there is no basis for such claim.  To best of the Company's knowledge, the use by the Company of such Ancillary Rights does not infringe on the rights of any person.

8.12.   **Contracts.**  All of the Existing Contracts listed in Schedule 1.1(d) are in full force and effect, and the Company to the best of its knowledge is not in default under any of

8.2.    **Corporate Power and Binding Effect; No Conflicts.**  The Company has all requisite power and full legal right to enter into this Agreement with Buyer, and to perform all of its agreements and obligations in accordance with its terms.  This Agreement has been duly authorized by the Company's directors and shareholders, has been duly executed and delivered by the Company, and (assuming due execution and delivery of Agreement by Buyer) constitutes the legal, valid and binding obligations of the Company, enforceable against it in accordance with its terms, subject only to the effects of bankruptcy, insolvency and similar laws protecting creditors and the application of general principles of equity, whether considered in a proceeding at law or in equity.  Neither the execution, delivery or performance by the Company of this Agreement will result in any violation of or default or creation of any lien under, or the acceleration or vesting or modification of any right or obligation under, or in any conflict with, the Articles of Incorporation of the Company or of any agreement, instrument, statute, rule or regulation, or of any judgment, injunction, decree, award or order of any court or state or federal governmental or regulatory body, binding on or applicable to the Company.

8.3.    **Validity of Leases, Licenses and Third Party Consents.**  The Company has obtained all consents, approvals, leases or licenses, governmental and private, necessary for the ordinary course of the Business as presently conducted, and consummating the Transaction contemplated will not alter or impair any such approval, lease or license, each of which is freely transferable and/or assignable by the Company to Buyer or may be obtained by Buyer in its own name and right without undue delay or expense.   Schedule 8.3 lists all consents, approvals, authorities and requirements prescribed by any law, rule or regulation, or any contract, agreement, commitment or undertaking, which must be obtained or satisfied by the Company to consummate the Transaction.

8.4.    **Financial Records.**  All of the Financial Records provided to Buyer were prepared according to general industry standards and procedures and fairly and accurately present the financial condition and results of operation of the Company as of the dates thereof.

8.5.    **Absence of Certain Changes.**  Except as disclosed in Schedule 8.5 and in financial documents provided to Buyer, since the date of the Company's latest full-year balance sheet, the Company has not to the best of its knowledge (i) sold, transferred or otherwise disposed of any properties or assets used in connection with the Business (including of the type included in the Purchased Assets) outside the ordinary and normal course of business for less than fair market value, (ii) mortgaged, pledged or subjected to any lien, any of the Purchased Assets, (iii) acquired any property or assets used in connection with the Business (including the Purchased Assets) outside the ordinary and normal course of business for more than fair market value, (iv) sustained any damage, loss or destruction of or to the Purchased Assets (whether or not covered by insurance), (v) entered into any transaction or otherwise conducted the Business other than in the ordinary and normal course of business, (vi) modified, amended, canceled or terminated any contracts or commitments under circumstances any of which would materially and adversely affect the Company's condition (financial or otherwise), results of operations, its business, assets, liabilities or prospects.  Except as disclosed in Schedule 8.5, since the date of the Company's latest full-year balance sheet, the Company is not aware of any action or inaction on the Company's part that has or would materially and adversely changed its relationships with suppliers, customers or lessors.

- 9 -

them and the Company has not received any notice of default, nor to the best of the Company's knowledge, is any other party to any such contract in default thereunder. To the best of the Company's knowledge, no event or condition exists which, after notice, lapse of time or both would constitute a default thereunder. Any and all required consents or approvals for the Existing Contracts to continue in full force and effect following the consummation of the Transaction have been obtained. None of the Existing Contracts includes any provision the effect of which may be to terminate such contract or enlarge or accelerate any obligations of the Company thereunder or give additional rights to any other party thereto upon consummation of the Transaction. As a part of Buyer's due diligence, the Company will provide to Buyer access to true, correct and complete copies of all such written contracts, together with all modifications and supplements thereto and shall not remove such written contracts from the Company's current facility following the Closing.

8.13.   **Brokers**. No finder, broker, agent or other intermediary has acted for or on behalf of the Company in connection with the negotiation or consummation of the Transaction.

8.14.   **Compliance with Other Instruments, Laws, etc**. The Company has complied with, and is in compliance with, (a) all laws, statutes, governmental regulations and all judicial or administrative tribunal orders, judgments, writs, injunctions, decrees or similar commands applicable to the Company and the Business, and (b) all unwaived terms and provisions of all contracts, agreements and indentures to which the Company is a party, or to which the Company or any of the Purchased Assets or the Business may be subject.

9.    **REPRESENTATIONS AND WARRANTIES OF BUYER**. Buyer represents and warrants that:

9.1.   **Organization and Standing of Buyer**. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of Illinois.

9.2.   **Corporate Power of Buyer, Binding Effect on Buyer; No Conflicts**. Buyer has all requisite power and full legal right to enter into this Agreement and to perform all of its agreements and obligations in accordance with its terms. This Agreement has been duly authorized, executed and delivered by Buyer and (assuming due execution and delivery of Agreement by the Company) constitute the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their terms, subject only to the effects of bankruptcy, insolvency and similar laws protecting creditors and the application of general principles of equity, whether considered in a proceeding at law or in equity. Neither the execution, delivery or performance by Buyer of this Agreement will result in any violation of or default under or be in conflict with the Articles of Organization of Buyer, or of any agreement, instrument, statute, rule or regulation, or of any judgment, injunction, decree, award or order of any court or state or federal governmental or regulatory body, binding on or applicable to Buyer.

9.3.   **Brokers**. No broker, finder, agent or other intermediary has acted for or on behalf of Buyer in connection with the negotiation or consummation of this Agreement, or the Transaction.

- 11 -

9.4. **Litigation, etc.** There is no action, suit, proceeding or investigation (whether conducted by any judicial or regulatory body or other person) pending or, to the knowledge of Buyer, threatened against Buyer, nor is there any basis for any claim or action known to Buyer, which might adversely affect any action taken or to be taken pursuant to this Agreement. There is no basis for any claim or action known to Buyer which might impair the right or the ability of Buyer to carry on the Business after the Closing in the same manner as the Business is conducted currently.

10. **ADDITIONAL COVENANTS OF THE COMPANY.** After the Closing Date, the Company covenants and agrees as follows:

10.1. **Maintenance of Records.** After the Closing Date, the Company shall deliver to Buyer and/or provide Buyer with access (including an opportunity to make copies), during normal business hours and upon notice, to all of the Company's books and records which relate to the Business. The Company shall preserve and maintain such records in a single location for at least three (3) years after the Closing Date.

10.2. **Further Assurances and Cooperation.** The Company agrees that, from time to time after the Closing Date, it will execute and deliver to Buyer such further assignments, instruments of sale, or other written assurances as Buyer may reasonably request to perfect and protect Buyer's title to the Purchased Assets. Company shall otherwise cooperate with Buyer to any extent reasonably required in order to fully accomplish the Transaction and to vest title in Buyer, and put Buyer in possession of, all of the Purchased Assets and the Business. The Company shall use best efforts and cooperate with Buyer in, at Buyer's sole option, securing the employment of key personnel of the Business. If Buyer elects to hire any key employees of the Business, the Company expressly waives any and all non-competition provisions of such employee's employment contract, and release such employee from the terms of such employment contract.

11. **OTHER AGREEMENTS.**

11.1. **Public Announcements.** Unless required to be made under any law, regulation or other requirement of any governmental authority to which the parties are subject, none of the parties shall make any public announcement or issue any press release regarding this Agreement or the Transaction without the prior written consent of the other party.

11.2. **Compliance with Bulk Sales Laws.** Notwithstanding anything to the contrary contained herein, the sale, transfer, purchase and acquisition of the Purchased Assets shall be conducted according to and in full compliance with, and Company agrees to do all acts necessary to comply as a transferor and for Buyer to comply with all laws relating to or affecting bulk transfers and sales, specifically, but not limited to obtaining appropriate stop payment letters from the Illinois Department of Revenue and Illinois Department of Employment Security.

11.3. **Expenses.** Each party will bear its own legal, accounting and other expenses incurred in connection with this Agreement and the Transaction.

R-C

- 12 -

12.     **INDEMNIFICATION.**

12.1.   <u>**Indemnification by the Company**</u>.

(a)     The Company, agrees to defend, indemnify and hold harmless Buyer and its successors, assigns and affiliates, from, against and regarding any and all costs, liabilities and damages resulting from:

(i)     misrepresentations or breaches of representations and warranties by the Company, or failure by the Company to perform or otherwise fulfill any covenant, undertaking or other agreement or obligation;

(ii)    claims against Buyer arising in connection with any self-funded warranties sold by the Company to its customers, breach of contract, death, personal injury, other injury to persons, property damage, losses or deprivation of rights (whether based on statute, negligence, breach of warranty, strict liability or any other theory) caused by or resulting from, directly or indirectly, the sale of any product, or the provision of any services in connection with the Business prior to the Closing Date, or any other claims asserted against Buyer arising from any action or inaction of the Company regarding the Business prior to the Closing Date;

(iii)   any action taken by any third party alleging the Company breached an agreement with such other party regarding acquiring the shares (by purchase, merger or consolidation) or assets of the business of the Company, or that Buyer tortuously interfered with such agreement; and

(iv)    any and all actions, suits, proceedings, claims, liabilities, demands, assessments, judgments, costs and expenses (including reasonable attorneys' fees) incident to any of the foregoing; <u>provided, however</u>, that Buyer shall make no claim for indemnification unless the amount of all such claims by Buyer exceeds Two Hundred Thousand Dollars ($200,000.00) and thereupon Buyer shall be entitled to indemnification for any amount over such sum.

(b)     The Company's representations and warranties, and any claim for indemnification or other cause of action based upon a breach of any representation or warranty or covenant of the Company, shall survive the Closing for a period of two (2) years after the Closing Date <u>except</u> <u>for</u>:

(i)     any claim which, within such period, Buyer under this Section 12 shall have asserted a claim in writing against Company which identifies with reasonable specificity the basis of the claim, shall survive until it is resolved; and

(ii)    any claim as to a representation, warranty, covenant or agreement of the Company relating to title.

12.2.   <u>**Notice and Defense of Claims Against the Buyer**</u>.  If a claim, liability, demand, assessment, action, suit or proceeding subject to the indemnification provisions in this

- 13 -

R - C

Section 12 is asserted by any third party (the "Buyer Indemnified Claims"), the following shall apply:

        (a)    Buyer shall promptly notify the Company; however, no delay in such notice shall relieve the Company from any liability or obligation unless (and only to the extent that) the Company has been damaged by such delay;

        (b)    The Company shall have the right, upon written notice to Buyer, to employ counsel, at its sole expense, and to assume control of the defense, compromise or settlement of any such Buyer Indemnified Claims; provided that, chosen counsel is reasonably satisfactory to Buyer and subject to the rights of, or duties in, any insurer or other third person having liability therefor;

        (c)    Buyer may also retain counsel for its representation, at Buyer's sole expense, with whom counsel for the Company shall cooperate;

        (d)    any settlement, compromise or agreed judgment by the Company shall include an enforceable provision requiring the claimant to release Buyer from all liability with respect thereto, unless Buyer grants written consent to forego this provision; and

        (e)    if the Company fails to give Buyer the notice described in Section 12.2(b) within sixty (60) days of receiving notice of the Indemnified Claim, Buyer may defend against, or enter into any settlement or compromise regarding the matter in any manner it may deem appropriate, subject to the Company's obligation to indemnify.

        12.3.  **Indemnification of Claims Against the Company**.  If a claim, liability, demand, assessment, action, suit or proceeding subject to the indemnification provisions in this Section 12 is asserted by any third party (the "Company Indemnified Claims"), the following shall apply:

        (a)    The Company or Chaudary shall promptly notify the Buyer; however, no delay in such notice shall relieve the Buyer from any liability or obligation unless (and only to the extent that) the Buyer has been damaged by such delay;

        (b)    The Buyer shall have the right, upon written notice to the Company and/or Chaudary, to employ counsel, at its sole expense, and to assume control of the defense, compromise or settlement of any such Company Indemnified Claims; provided that, chosen counsel is reasonably satisfactory to the Company and/or Chaudary, as the circumstances require, and subject to the rights of, or duties in, any insurer or other third person having liability therefor;

        (c)    The Company and/or Chaudary, as the circumstances require, may also retain counsel for its representation, at its, his or their sole expense, with whom counsel for the Buyer shall cooperate;

        (d)    any settlement, compromise or agreed judgment by the Buyer shall include an enforceable provision requiring the claimant to release the Company and/or Chaudary, as the circumstances require, from all liability with respect thereto, unless Company

- 14 -

and/or Chaudary, as the circumstances require, grants written consent to forego this provision; and

     (e) if Buyer fails to give the Company and/or Chaudary, as the circumstances require, the notice described in Section 12.3(b) within sixty (60) days of receiving notice of the Indemnified Claim, the Company and/or Chaudary, as the circumstances require, may defend against, or enter into any settlement or compromise regarding the matter in any manner it may deem appropriate, subject to the Company's obligation to indemnify.

  13.  **GENERAL PROVISIONS.**

    13.1. **Entire Agreement.** This Agreement (including the Exhibits, Schedules hereto and the other agreements expressly referenced) sets forth the entire understanding of the parties regarding its subject matter, and supersedes any prior understandings, agreements, arrangements, communications, discussions, or representations, oral or written among the parties, that may have related in any way to its subject matter.

    13.2. **Amendments; Waivers.** This Agreement may be amended only in a writing signed by all of the parties. Any failure by a party to comply with any of its obligations or agreements herein contained may be waived only in a writing signed by the party or parties against whom the waiver is sought to be enforced.

    13.3. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of Illinois.

    13.4. **Definition.** As used in this Agreement, the term "substantially in the same amount", shall mean a variance of no more than plus or minus ten percent (10%).

    13.5. **Jurisdiction; Service of Process.** Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the County of Cook, State of Illinois, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

    13.6. **Notices.** All notices and other communications shall be in writing and shall be deemed to have been duly given (i) when received, if personally delivered or provided via electronic mail, (ii) within three (3) days after being sent by registered or certified mail, return receipt requested, first-class postage prepaid, or (iii) within one (1) business day after being by reputable overnight courier, to the parties (and to persons to whom copies shall be sent) at their respective addresses set forth below. Any party, by written notice to the others in the manner herein provided, may designate an address different from that set forth below.

| | |
|---|---|
| If to the Company or Chaudary: | Raani Corporation<br>9155 Forest Edge Drive<br>Burr Ridge, IL 60527<br>Attention: Rashid Chaudary<br>e-mail: Rashid.Chaudary@gmail.com |
| With a copy for notice purposes only to: | Gregory J. Jordan<br>Jordan & Zito LLC<br>55 West Monroe Street, Suite 3600<br>Chicago Illinois 60603<br>e-mail: gjordan@jz-llc.com |
| If to Buyer to: | Alliant Manufacturing, LLC<br>18W100 22nd Street, Suite 105<br>Oakbrook Terrace, IL 60181<br>Attention: John T. Gruenwald<br>e-mail: |
| With a copy for notice purposes only to: | William D. Kelly, Esquire<br>Kelly & Karras, Ltd.<br>1010 Jorie Boulevard, Suite 100<br>Oak Brook, IL 60523<br>e-mail: billkelly@kellykarras.com |

13.7.   **Binding Effect; Benefits of Agreement**.   This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.   This Agreement shall not be assignable by any party hereto without the prior written consent of the other party, provided that Buyer may assign its rights under this Agreement to an affiliated entity.   Nothing in this Agreement, express or implied, is intended to confer upon any person other than the parties hereto and their said successors and permitted assigns, any rights under or by reason of this Agreement and any benefit conferred is incidental to this Agreement.

13.8.   **Counterparts**.   This Agreement may be executed by the parties in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

* Signatures Appear on Following Page *

- 16 -

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

**COMPANY:**

**RAANI CORPORATION**

By: _Rashid Chaudary_
      Rashid Chaudary
      President

**BUYER:**

**ALLIANT MANUFACTURING, LLC**

By: _John T. Gruenwald_
      John T. Gruenwald
      Managing Member

_Rashid Chaudary_
RASHID CHAUDARY, only as to those obligations specifically set forth herein

_Saeed R. Khan_
SAEED R. KHAN, only as to those obligations specifically set forth herein

_Rizwan K_
RIZWAN KHAN, only as to those obligations specifically set forth herein

_John T. Gruenwald_
JOHN T. GRUENWALD, only as to those obligations specifically set forth herein

- 17 -

## RIDER TO ASSET PURCHASE AGREEMENT

This Rider to Asset Purchase Agreement dated June 28, 2013, by and between **Alliant Manufacturing, LLC, an Illinois limited liability company** ("Buyer"), and **Raani Corporation, an Illinois corporation** (the "Company") is as follows:

**WHEREAS**, on June 7, 2013, Buyer and Company entered into a certain Asset Purchase Agreement (the "Agreement") under which the Company agreed to sell, and the Buyer agreed to purchase, certain of the Company's assets, all as more fully set forth in the Agreement; and

**WHEREAS**, under the terms of the Agreement, at the Closing, Buyer will execute three (3) separate Promissory Notes in favor of the Company, each of which are to be secured by a lien on the Purchased Assets as that term is defined in the Agreement, which lien is to have priority over all other liens except any lien granted to and held by Cole Taylor Bank; and

**WHEREAS**, to induce Cole Taylor Bank to make loans to Buyer, it is necessary that any security interest to be held by the Company in the Purchased Assets under the Agreement be subordinated to any liens to be granted to Cole Taylor Bank.

**NOW, THEREFORE**, in consideration of the foregoing recitals, which are hereby made a part of this Agreement, and the mutual covenants and agreements set forth herein and in the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Defined Terms.** Any term used herein shall have the same meaning as set forth in the Asset Purchase Agreement.

2. **Subordination.** The Company covenants, consents and agrees that any and all security interests to be granted by the Buyer to the Company are and shall continue to be subject and subordinate to any liens granted by Buyer in favor of Cole Taylor Bank to fund the sale of the Company's assets to the Buyer.

3. **Payment.** The Company acknowledges and agrees that it will not be entitled to receive payment from the Buyer on any of the three (3) Promissory Notes identified in the Agreement unless Buyer is in compliance with the Buyer's covenants made to Cole Taylor Bank, as identified in Exhibit A, which will be made as a part of the loan made by Cole Taylor Bank to Buyer to fund the sale of the Company's assets to the Buyer.

4. **Buyer Distribution to Members.** Buyer acknowledges and agrees that it shall not make any distribution of funds, whether as draws, advances, expense reimbursements or otherwise, to any of the persons who are currently members of the Buyer (or to any of their respective successors or assignees) unless, at the time of any such distribution, the Buyer is in full compliance with each of the covenants made to Cole Taylor Bank, as identified in Exhibit A. Buyer acknowledges and agrees that it shall not make any distribution of funds as a salary in excess of One Hundred Eighty Thousand Dollars ($180,000) per annum to any of the persons who are currently members of the Buyer (or to any of their respective successors or assignees) and then only to the extent that such member works at least forty (40) hours per week on the



EXHIBIT
2

Buyer's behalf unless, at the time of any such salary payment, the Buyer is in full compliance with each of the covenants made to Cole Taylor Bank, as identified in Exhibit A.

    5.    **Asset Purchase Agreements.**   In all other respects, the Agreement shall remain in full force and effect.

**ALLIANT MANUFACTURING, LLC**

By: _____
       Rizwan D. Khan

    One of Its ~~Members~~ MANAGERS

**RAANI CORPORATION**

By: _____
       Rashid Chaudary
       President

- 2 -

# COVENANTS

1. Minimum Combined Global Debt Service Coverage equal or greater than 1.20x, which is defined as adjusted Earnings before interest, taxes, depreciation, and amortization, divided by the required principal and cash interest on all debt obligations, unfunded capital expenditures and Distributions and is measured annually.

2. Minimum Profitability of $500,000, which is defined as Net Income after Distributions and is measured annually.

3. Minimum Total Capital of $2,000,000, which is defined as Total Assets less Total Liabilities and is measured quarterly.

4. Cole Taylor Bank has received the accountant Reviewed FYE 2013 statements, which confirm that all of the above covenants are in compliance.

5. The Buyer reports a minimum EBITDA of $800,000 at FYE 2013 or the Buyer has paid the $410,000 note granted to Cole Taylor Bank from outside capital.

Note: Cole Taylor Bank will look at annualize Net Income for compliance of the Minimum Profitability Covenant at December 31, 2013.

Note: The first test period for covenants will be measured quarterly on 09/30/13 and annually on 12/31/13.